UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
CHERYL VOLPE,                                               :
                                                            :
                        Plaintiff,                          :
                                                            :                15-cv-7110 (KBF)
            -v-                                             :
                                                            :                OPINION & ORDER
NEW YORK CITY DEPARTMENT OF                                 :
EDUCATION, and OLIVIA FRANCIS-                              :
WEBBER, in her official capacity as Principal              :
of PS 114X and in her individual capacity                  :
                                                            :
                        Defendants.                         :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 14, 2016

KATHERINE B. FORREST, District Judge:

        Plaintiff Cheryl Volpe, a special education teacher in the New York public

school system, brings the instant action against her employer, New York City

Department of Education, and her supervisor, Principal Olivia Francis-Webber.

Volpe alleges that defendants subjected her to impermissible retaliation and

violated her rights to equal protection of the law and to be free of unlawful searches

and seizures.  Now before the Court is defendants' motion to dismiss this case.  For

the reasons stated below, the motion is GRANTED in part and DENIED in part.

I.      FACTUAL BACKGROUND[1]

        Volpe has been a special education teacher within the Department for more

than 30 years.  (FAC ¶ 2.)  She has taught at a Bronx primary school, Luis Llorens

Torres Children's Academy, also known as PS 114X, since 2005.  (Id. ¶ 6.)  From

---

[1] For purposes of this motion, the Court accepts all well-pled allegations in Volpe's amended complaint as true.

2005 to June 2011, Volpe was a Special Education Teacher Support Services ("SETTS") teacher.  (Id. ¶ 18.)  As a SETTS teacher, she performed a variety of academic and administrative tasks in support of special education students at PS 114X.  (Id. ¶ 19.)  During the entirety of Volpe's employment at PS 114X, Francis-Webber was and continues to be the principal.  (Id. ¶ 7.)

The crux of Volpe's complaint is that she has been impermissibly mistreated because she has advocated for the special education students at PS 114X.  (See id. ¶ 15.)  She alleges that while she and other teachers who actively opposed disability discrimination were treated maliciously, teachers who did not advocate on behalf of special education students were not.  (Id. ¶ 49.)  Her complaint lists a number of instances in which she alleges she attempted to advance these students' interest and a number of acts on the part of Francis-Webber and the Department that she alleges were retaliatory and otherwise unlawful.

The first category of advocacy Volpe alleges is imprecisely defined.  The complaint alleges that "[t]hroughout her tenure at PS 114X, and specifically from 2008 until the end of the 2014-2015 academic year and on a continuous and ongoing basis," she took a number of steps.  (Id. ¶ 15.)  Although she states that the list is not exhaustive, the allegations enumerate "report[s] and/or complain[ts] to defendants and/or outside agencies overseeing defendants, via special education complaints (or "SE Complaints") or otherwise."  (Id.)  The complaint includes six topics these reports concerned: (1) failure to provide certain special education

2

students with services to which they were entitled; (2) Volpe's exclusion from IEP[2] meetings she was legally required to attend; (3) failure to perform required evaluations of special education students; (4) attendance by the wrong teachers at IEP meetings; (5) changes to an IEP after the meeting at which it should have been established and alteration of the written goals for that student which Volpe had previously written; and (6) failure to provide special education teachers for Integrated Co-Teaching classrooms.  (Id.)  Except as specifically noted below, the complaint does not allege when, to whom, or how Volpe made these reports and complaints.

The complaint does contain more specific allegations on other points.  At the start of the 2008-09 school year, Francis-Webber removed Volpe from the SETTS Resource Room position she had held since 2005.  (Id. ¶ 20.)  Volpe alleges that this was "retaliation for Ms. Volpe's suggestion that PS 114X request support from defendants for Bilingual SE students who had been identified as the lowest performing student population at PS 114X."  (Id.)  Volpe successfully grieved the removal and was reinstated.  (Id. ¶ 21.)  In October 2008 Francis-Webber eliminated Volpe's position and hired six special education teachers to provide SETTS services after school, but this too was reversed when the Department directed Francis-Webber to reinstate Volpe to her position.  (Id. ¶ 23.)

---

[2] An IEP, or Individualized Education Program, is a written statement that sets out a special education student's present educational performance, objectives for improvement, and specially designed instruction and services.  See 20 U.S.C. § 1414(d).

Approximately three and a half years later, in March 2011, Francis-Webber "and the school administration at PS 114X" accused Volpe of taking files from the Assistant Principal's office.  (Id. ¶ 24.)  Volpe had been working in that office updating individual special education students' education plans.  (Id.)  At roughly the same time, Francis-Webber informed Volpe that she planned to direct her to submit to a psychological evaluation.  (Id. ¶ 25.)  The next month, another Department employee told Volpe that Francis-Webber intended to make her work conditions intolerable in order to force her to leave the school.  (Id. ¶ 26.)

In April or May 2011, Volpe met with reviewers from the Department's Joint Intervention Team ("JIT"), a team charged with overseeing and reviewing the provision of special education services.  (Id. ¶ 27.)  Volpe and another PS 114X employee shared specific concerns about the provision of those services at PS 114X. (Id.)  Two months later, in June 2011, Francis-Webber singled out Volpe and the other employee during an employee-wide meeting by accusing them of being "against the school" and suggesting that they "should go elsewhere."  (Id. ¶ 28.)

In September 2011, the start of the next school year, Francis-Webber removed Volpe from her SETTS position for a third time.  (Id. ¶ 29.)  Volpe grieved this removal, which resulted in a grievance hearing in March 2012.  (Id. ¶ 30.) According to a February 2013 Office of Special Investigations report which Volpe attached to her amended complaint, during the grievance hearing Volpe submitted a job posting for a monolingual[3] SETTS position in support of her argument that

---

[3] As opposed to a bilingual position which would have required an applicant to speak both English and Spanish.

she should have been retained.  (Id. Exh. A.)  Francis-Webber accused Volpe of having forged the document, and Volpe lost the grievance.[4]  (Id. ¶ 30.)  The complaint alleges that this accusation, which is discussed further below, was false. (Id.)

In May 2012, Volpe filed another grievance, this time over Francis-Webber's direction that Volpe and other special education teachers perform breakfast duty, as a result of which some special education students were improperly in classrooms without special education teachers.  (Id. ¶ 31.)  After this complaint, Francis-Webber discontinued the practice.  (Id.)

In December 2012, Volpe filed a written complaint with the Department's Chancellor.  (Id. ¶ 32.)  This written complaint detailed the ways Francis-Webber had harassed Volpe and subjected her to a hostile work environment.  (Id.) According to the operative complaint in this action, the Department's investigation consisted of interviews with Volpe and Francis-Webber and did not result in disciplinary action.  (Id.)

In February 2013, the investigation into the accusation that Volpe had forged and submitted a document during the March 2012 grievance hearing discussed above was completed.  (Id. Exh. A.)  The resulting Closing Memorandum determined that the allegations against Volpe had been substantiated.  (Id.)  On March 22, 2013, Francis-Webber held a conference with Volpe, her immediate

---

[4] The complaint does not specify what resulted from this lost grievance, as Volpe appears to have continued her employment as a special education teacher at PS 114X.

supervisor, and a union representative to discuss the misconduct allegation.  (Id.)
The union representative contested whether the investigation had been properly
performed and stated that she had received the job posting at issue from the
school's secretary and forwarded it to Volpe.  (Id. & ¶ 34.)  The same day, Francis-
Webber wrote a letter informing Volpe that she had concluded that Volpe submitted
a forged document to the arbitrator during the March 2012 grievance hearing, and
that "disciplinary action, including an unsatisfactory rating and disciplinary
charges that could lead to the termination of your employment," might result.  (Id.
Exh. A.)

        In April 2013, Francis-Webber initiated charges against Volpe under New
York Education Law § 3020-a, which sets out the disciplinary procedures and
penalties for public school teachers in the state.  (Id. ¶ 36.)  The charges, which are
attached to Volpe's amended complaint, allege that Volpe knowingly submitted a
forged document with intent to defraud the Department.  (Id. Exh. B.)  On April 8,
2013, the secretary at PS 114X sent Volpe's personnel file to an attorney with the
Department's Administrative Trials Unit.  (Id. Exh. C.)  The personnel file included
Francis-Webber's March 22, 2013 letter referencing the union representative's
statement that she had received the posting and forwarded it to Volpe.  (Id. ¶ 37.)

        In early August 2013, an individual from the Administrative Trials Unit
requested that the Office of Special Investigations interview a new witness in
connection with the § 3020-a proceeding: Volpe's union representative.  (Id. Exh. C.)
The subsequent amended report, issued August 13, recounts the representative's

6

testimony that she received the allegedly forged document from the school secretary and forwarded it to Volpe, which was supported by the fact that the representative still had a packet of job postings which contained the allegedly fraudulent document.  (Id.)  After the secretary confirmed that she provides the union representative with postings, the Office of Special Investigations recommended changing its conclusion regarding Volpe's alleged misconduct from substantiated to unsubstantiated.  (Id.)

On August 15, 2013, the Department withdrew all charges against Volpe brought pursuant to Education Law § 3020-a.  (Id.)

During the ensuing 2013-14 academic year, Volpe filed a number of complaints and reports which faulted PS 114X's administration for not evaluating special education students at parents' requests and for not providing support to special education students with dangerous tendencies.  (Id. ¶ 40.)  When the reports about inadequate support for students with violent propensities went unheeded, Volpe filed numerous safety and incident reports with her union.  (Id. ¶ 41.)

Between October 2013 and February 2014, Francis-Webber repeatedly summoned Volpe to disciplinary meetings, and disciplinary letters were placed in Volpe's personnel file.  (Id. ¶ 42.)  The amended complaint alleges that these meetings and letters had no basis in law or fact.  (Id.)

On December 18, 2013, Volpe attempted to speak with a parent of a special education student who had been transferred out of her class.  (Id. ¶ 43.)  The student's annual IEP meeting was scheduled for later that day.  (Id.)  After the

attempted conversation, Francis-Webber "directed that the Dean of PS 114X escort Ms. Volpe to his office and not let her out of his sight." (Id.)  In the Dean's office, Francis-Webber "pointed and waved her finger at plaintiff;" she then told Volpe to report to a different office, where she was watched over by an Assistant Principal and another worker for three and a half hours.  (Id. ¶¶ 44-46.)  The student's IEP meeting took place during that period.  (Id. ¶ 46.)

In March 2014, another PS 114X employee told Volpe that Francis-Webber had asked certain employees to watch Volpe closely in search of any incidents that might be the basis for a misconduct charge.  (Id. ¶ 47.)

In September 2014, Francis-Webber removed Volpe from her Integrated Co-Teaching position and placed her instead "in a self-contained 2/3rd grade class." (Id. ¶ 48.)  Volpe alleges that this was contrary to an election she made on her preference sheet and in violation of her union contract.  (Id.)

Volpe filed her original complaint in this action on September 9, 2015. (ECF No. 1.)  She amended the complaint on December 21, 2015.  (ECF Nos. 20 & 21.)  Defendants have now moved to dismiss the amended complaint.  (ECF Nos. 23-25, 31-32, 36.)

## II.   PRINCIPLES OF LAW

### A.   Standard on a Motion to Dismiss under Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a plaintiff must provide grounds upon which his

claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id. The Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). Knowledge and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b). A plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly within the possession and control of the defendant." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010). But, if the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate. Twombly, 550 U.S. at 570; Starr, 592 F.3d at 321 (quoting Iqbal,

556 U.S. at 679).  In deciding a 12(b)(6) motion, the Court may not consider evidence proffered by any party, but is instead limited to the allegations in the complaint and facts from documents either referenced therein or relied upon in framing the complaint.  See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

III.    DISCUSSION & ANALYSIS

A.    The Fourth Amendment Claim

The Fourth Amendment to the Constitution protects "against unreasonable searches and seizures."  When a public employer invades the privacy interests of a government employee for either "noninvestigatory, work-related purposes" or "investigations of work-related misconduct," the standard that is applied is one of "reasonableness under all the circumstances."  O'Connor v. Ortega, 480 U.S. 709, 725-26 (1987) (plurality); see also City of Ontario, Cal. v. Quon, 560 U.S. 746, 756-57 (2010) (noting existence of "two O'Connor approaches").  This standard applies to "both the inception and the scope of the intrusion."  O'Connor, 480 U.S. at 726.

Unsurprisingly, cases evaluating the contours of Fourth Amendment confinement in schools more commonly feature students rather than teachers.  See, e.g., Schafer v. Hicksville Union Free Sch. Dist., No. 06-CV-2531(JS)(ARL), 2011 WL 1322903, at *8 (E.D.N.Y. Mar. 31, 2011) (denying defendants summary judgment on Fourth Amendment claim where "the evidence is inconclusive as to how many times Billy was put in the timeout room, let alone the circumstances that prompted the confinement in each case"); DeFelice ex rel. Defelice v. Warner, 511 F.

10

Supp. 2d 241, 248 (D. Conn. 2007) (granting qualified immunity on Fourth Amendment claim to school security aide who questioned student in an office for 20 to 30 minutes).

The Supreme Court "has 'repeatedly refused to declare that only the least intrusive search practicable can be reasonable under the Fourth Amendment.'" Quon, 560 U.S. at 763 (quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 663 (1995)). Additionally, the Court has noted the need to "balance the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control, and the efficient operation of the workplace." O'Connor, 480 U.S. at 719-20 (plurality); see also id. at 732 (Scalia, J., concurring in the judgment) ("'[S]pecial needs' are present in the context of government employment."). On the one hand, public servants "are not relegated to a watered-down version of constitutional rights." Garrity v. New Jersey, 385 U.S. 493, 500 (1967). On the other, there is a "common-sense realization that government offices could not function if every employment decision became a constitutional matter." Connick v. Myers, 461 U.S. 138, 143 (1983).

In Reyes v. Maschmeier, 446 F.3d 1199 (11th Cir. 2006), the Eleventh Circuit analyzed whether an abusive meeting between a sheriff's department employee and her supervisor gave rise to a Fourth Amendment claim. The Reyes court concluded that it did not because "her allegations do not remove the case from the employment setting," and thus "do not change the fundamental dynamic between her and [her supervisor] from an employment relationship into a situation where [the supervisor]

is acting as a law enforcer." Id. at 1204-05.  In an ensuing footnote, the court

raised, but left for another day, "the question of whether there must be

governmental authority to seize before there can be an unlawful government

seizure." Id. at 1205 n.6.

This approach is consistent with that adopted by the Second Circuit in an

unpublished decision, Demaine v. Samuels, 29 F. App'x 671 (2d Cir. 2002).  In

Demaine, a police officer was detained for about two hours, during which time he

was "surrounded by defendants, all superior officers in possession of their weapons,"

and "was not permitted to either leave or move about freely."  Id. at 674.  The officer

was never arrested, and during the search he "was on duty and thus compensated

for his time."  Id. at 676.  Because the Second Circuit found that both the decision to

search and the scope of the search was reasonable, it affirmed the district court's

dismissal of the officer's Fourth Amendment claim.  Id.

Under Reyes, Demaine, and the broader logic of Fourth Amendment cases in

the context of public employment, Volpe has failed to state a claim for violation of

the Fourth Amendment.  A contemporary email from Volpe's union representative,

which Volpe attached to her complaint, notes that while Volpe was in the Assistant

Principal's office, Francis-Webber was contacting the superintendent.  (FAC Exh.

D.)  Unlike the plaintiffs in Reyes and Demaine, neither of whom were found to

have been seized in violation of the Fourth Amendment, the school administrators

tasked with watching Volpe were not law enforcement officers empowered to arrest

Volpe or anyone else.  Recognizing a Fourth Amendment claim in these

12

circumstances would handicap the orderly administration of public workplaces, and this claim is accordingly dismissed.

      B.    <u>The Equal Protection Claim</u>

In the employment context, equal protection claims brought pursuant to § 1983 are analyzed according to the three-step procedure applicable in Title VII claims.  <u>Sorlucco v. New York City Police Dep't</u>, 888 F.2d 4, 6-7 (2d Cir. 1989).  At the first stage of this analysis, a plaintiff must carry the initial burden of establishing a prima facie case of discrimination by alleging, <u>inter alia</u>, that she is a member of a protected class.  <u>Id.</u> at 7; <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).

Volpe's complaint does not allege that she has been subject to a suspect classification.  The claimed class appears to be special education teachers who advocate on behalf of special needs children, but Volpe identifies no authority or logical reason to view this group as a protected class.  Indeed, the Second Circuit has rejected even the argument that disabled students <u>themselves</u> are a protected class for purposes of equal protection analysis.  <u>Suffolk Parents of Handicapped Adults v. Wingate</u>, 101 F.3d 818, 824 n.4 (2d Cir. 1996); <u>see also</u> <u>Chick v. Cnty. of Suffolk</u>, 546 F. App'x 58, 60 (2d Cir. 2013).  Volpe has thus failed to properly allege that she is a member of a protected class, and as such has failed to properly state a claim for employment discrimination in violation of the constitutional promise of equal protection.

At certain points, Volpe's amended complaint can be read to suggest that it advances a class-of-one equal protection claim; she at no point identifies any other PS 114X employee who advocated for special education students and faced retaliation.  (See, e.g. FAC ¶ 49.)  A class-of-one equal protection claim arises when an individual is "intentionally treated differently from others similarly situated and ... there is no rational basis for the difference in treatment."  Fortress Bible Church v. Feiner, 694 F.3d 208, 222 (2d Cir. 2012) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).

Class-of-one claims need not detain us long.  Any attempt to wring such a claim out of the amended complaint runs headlong into two separately dispositive barriers.  First, class-of-one plaintiffs must identify a non-injured comparator who displays such "an extremely high degree of similarity" that it "provide[s] an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose— whether personal or otherwise—is all but certain."  Clubside Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006) (quoting Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005)); see also DePrima v. City of New York Dep't of Educ., No. 12-CV-3626 (MKB), 2014 WL 1155282, at *6 (E.D.N.Y. Mar. 20, 2014).  Second, the Supreme Court has flatly held "that the class-of-one theory of equal protection does not apply in the public employment context."  Engquist v. Oregon Dep't of Agric., 553 U.S. 591, 598 (2008).  Because Volpe is a public employee who has not identified any other particular teacher who was highly, or indeed at all, similar in characteristics

14

but not treatment, her complaint does not state a valid class-of-one equal protection claim.

Because Volpe does not meet the requirements to state a claim for a violation of equal protection under either of the theories her amended complaint might be read to advance, the complaint as a whole fails to state an equal protection claim. This count is therefore properly dismissed.

      C.    <u>The ADA and Rehabilitation Act Retaliation Claim</u>

          1.    <u>Failure To Exhaust Under the ADA</u>

Volpe claims that the Department violated section 503 of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203.  (<u>See</u> FAC ¶¶ 4, 5, 59.)  That section, which appears in Title V of the ADA, prohibits retaliatory discrimination against an individual who has opposed any act or practice which the ADA makes unlawful.  <u>Id.</u> § 12203(a).  Defendants argue that the ADA requires claimants to exhaust administrative remedies before filing a civil suit, that the amended complaint contains no allegations of such exhaustion, and that the ADA claims must therefore be dismissed.  (ECF No. 25 at 9-11.)

"Whether an ADA claim must first be presented to an administrative agency depends on which precise title of the ADA the claim invokes."  <u>McInerney v. Rensselaer Polytechnic Inst.</u>, 505 F.3d 135, 138 (2d Cir. 2007).  Title V retaliation claims follow the same procedures as the Title that renders the opposed act unlawful in the first place; thus, for example, "Title V retaliation claims in the employment context require the same procedures as those under Title I, while

retaliation claims relating to public accommodations follow Title III procedures." Id. (citing 42 U.S.C. § 12203(c).)

At no point in the amended complaint does Volpe identify the precise Title of the ADA that underlies her retaliation claim. However, her memorandum of law in opposition to defendants' motion to dismiss invokes Title II (ECF No. 31 at 4),[5] which prohibits discrimination in the provision of public services. See 42 U.S.C. § 12132. The Court agrees with Volpe's belated description of her claim. Accepting all allegations in the amended complaint as true, the practices Volpe allegedly opposed related to the provision of special education services to students by a public entity, see id. § 12131(1), not any employment discrimination she herself suffered on the basis of disability. See id. § 12112(a). Those practices were thus prohibited by Title II. See, e.g. Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 146, 149 (2d Cir. 2002). The fact that the alleged retaliation occurred in a workplace at the hands of an employer does not bring it within Title I if the claim is not one for discrimination in employment on the basis of an employee's disability. See Barker v. Riverside Cnty. Office of Educ., 584 F.3d 821, 827-28 (9th Cir. 2009). Direct employment discrimination was the context in which the Second Circuit ruled that "[a] public employee may not bring a Title II claim against his or her employer," and that holding thus does not serve to eliminate Volpe's Title V retaliation claim. Mary Jo C. v. New York State & Local Ret. Sys., 707 F.3d 144, 171 (2d Cir. 2013).

---

[5] The Court accepts Volpe's invocation of Title II as binding. Retaliation claims based on Titles I or III would be properly dismissed either for failure to exhaust administrative remedies or timely file suit (Title I, see 42 U.S.C. § 12117(a)), or for failure to state a claim against a private entity (Title III, see id. §§ 1231(a), 12181(6)).

Title II's enforcement provision incorporates "[t]he remedies, procedures, and rights set forth in section 794a of Title 29." Id. § 12133.  Although that provision, like Title I of the ADA, incorporates certain procedures from the Civil Rights Act of 1964, it does not incorporate 42 U.S.C. § 2000e-5(e)(1), the statutory basis of the exhaustion requirement.  See 29 U.S.C. § 794a(a)(1).  This has led courts to hold that "Title II does not require [a plaintiff] to file a charge with the EEOC." Zimmerman v. Oregon Dep't of Justice, 170 F.3d 1169, 1172 (9th Cir. 1999).  "The Second Circuit has not decided the issue, but has suggested that Title II may not require exhaustion."  Cormier v. City of Meriden, No. CIVA.3:03CV1819(JBA), 2004 WL 2377079, at *6 (D. Conn. Sept. 30, 2004) (citing Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 545 (2d Cir. 2003)).

In evaluating whether administrative exhaustion is or is not required for an ADA claim, the Second Circuit has highlighted the "general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is presumed that Congress acts intentionally and purposely."  McInerney v. Rensselaer Polytechnic Inst., 505 F.3d 135, 138 (2d Cir. 2007) (quoting Barnhart v. Sigmon Coal Co., 543 U.S. 438, 452 (2002)).  Thus, the presence of an exhaustion requirement in ADA Title I and its absence from Title III means "there is no administrative-exhaustion requirement for ADA Title III claims or Title V claims predicated on asserting one's rights under Title III."  Id. at 139.  The same result obtains in the instant case: nothing in the

ADA required Volpe to exhaust her Title V claims predicated on Title II rights before filing the instant suit.

> ## 2.   The Statute Of Limitations

Both ADA retaliation claims and Rehabilitation Act retaliation claims are subject to a three year statute of limitations.  See De La Rosa v. Lewis Foods of 42nd Street, LLC, 124 F. Supp. 3d 290, 299 n.14 (S.D.N.Y. 2015) (ADA); Logan v. Matveevskii, 57 F. Supp. 3d 234, 267 (S.D.N.Y. 2014) (Rehabilitation Act).   The parties agree that this limitations period applies, but disagree about whether acts that occurred earlier than September 9, 2012 can nonetheless be considered on the theory that they are relevant to and constitute an ongoing hostile work environment.

Volpe extensively cites the case law surrounding the "continuing violation" doctrine developed in the context of hostile work environment claims under Title VII of the Civil Rights Act.  The seminal case in this area, National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), held that although "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period," a different rule governed hostile work environment claims.  Id. at 112.  Because "[s]uch claims are based on the cumulative effect of individual acts," as long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  Id. at 115, 117.  The Second Circuit has summarized the requirements: "To trigger the continuing violation doctrine when

challenging discrimination, the plaintiff 'must allege both the existence of an
ongoing policy of discrimination and some non-time-barred acts taken in
furtherance of that policy.'"  Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir.
2009) (quoting Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999)).

Volpe dedicates notably less space in her briefing to explaining why this
doctrine should be applied to her case.  As discussed below, a plaintiff asserting a
claim for retaliation must plausibly allege that an adverse action her employer took
was causally connected to the plaintiff's protected activity.  Attempting to draw that
connection between a particular protected activity and the necessarily nebulous
conduct that constitutes a hostile work environment presents obvious problems.
This might explain why every case Volpe cites in support of her standing to bring
this type of claim featured discrete retaliatory acts.  See Reinhardt v. Albuquerque
Public Schs. Bd. of Educ., 595 F.3d 1126, 1132-34 (10th Cir. 2010) (changed
assignment and reduction of salary); Barker v. Riverside Cnty. Office of Educ., 584
F.3d 821, 823 (9th Cir. 2009) (changed assignments, exclusion from meetings,
reduced caseload, and constructively terminated); Ehrlich v. N.Y.C. Leadership
Acad., No. 12 Civ. 2565(AKH), 2014 WL 2767179, at *5 (S.D.N.Y. May 29, 2014)
(dismissed from Aspiring Principal Program); DeCotiis  v. Whittemore, 842 F. Supp.
2d 354, 359 (D. Me. 2012) (contract not renewed); Stahura-Uhl v. Iroquois Cent.
Sch. Dist., 836 F. Supp. 2d 132, 144 (W.D.N.Y. 2011) (suspended); Whittaker v. St.
Lucie Cnty. Sch. Bd., No. 10-14172-CIV, 2011 WL 3424564, at *2 (S.D. Fla. Aug. 5,
2011) (terminated); Knaub v. Tulli, 788 F. Supp. 2d 349, 353-54 (M.D. Pa. 2011)

(suspended and terminated); <u>Manigaulte v. C.W. Post of Long Island Univ.</u>, 659 F. Supp. 2d 367, 374 (E.D.N.Y. 2009) (terminated); <u>Felton v. Katonah Lewisboro Sch. Dist.</u>, No. 08 Civ. 9340(SCR), 2009 WL 2223853, at *2-3 (S.D.N.Y. July 27, 2009) (one plaintiff constructively discharged, other fired); <u>Corrales v. Moreno Unified Sch. Dist.</u>, No. EDCV-08-00040-SGL (OPx), 2008 WL 4382507, at *1 (C.D. Cal. Aug. 29, 2008) (contract not renewed); <u>Ryan v. Shawnee Mission Unified Sch. Dist. No. 512</u>, 437 F. Supp. 2d 1233, 1245 (D. Kan. 2006) (told district no longer wanted, or had position for, plaintiff); <u>Sturm v. Rocky Hill Bd. of Educ.</u>, No. 3:03CV666AWT, 2005 WL 733778, at *1 (D. Conn. Mar. 29, 2005) (contract not renewed); <u>Ross v. Allen</u>, 515 F. Supp. 972, 974 (S.D.N.Y. 1981) (terminated).

None of the cited cases rely on a retaliatory hostile work environment theory, and none invoke the continued violation doctrine to sweep in untimely allegations. However, there are some cases in which courts have recognized a hostile work environment as a cognizable retaliatory act. <u>See, e.g.</u>, <u>Scalafani v. PC Richard & Son</u>, 668 F. Supp. 2d 423, 438-39 (E.D.N.Y. 2009). Therefore, for purposes of evaluating Volpe's claim that she was subject to a retaliatory hostile work environment, the Court will consider all allegations that are properly pleaded as instances of a continuing violation. On the other hand, for purposes of evaluating Volpe's claim that she was subject to discrete retaliatory acts, the three year statute of limitations excludes all allegations that predate September 9, 2012.

3.     The Retaliatory Hostile Work Environment Claim

Retaliation claims under the Rehabilitation Act and the ADA are governed by the same standards.  Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). To establish such a claim, a plaintiff must show "that: (1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity."  Id.

A "materially adverse action" is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  A hostile work environment may constitute an adverse employment action in the context of a retaliation claim. Thomas v. iStar Financial, Inc., 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006).

In order to plead a hostile work environment, a plaintiff must allege that her "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).  The conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment."  Id.  It must also be "sufficiently continuous and concerted to have altered conditions of an employee's employment."  Thomas, 438 F. Supp. 2d at 365. The totality of the circumstances must be considered, "including 'the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004) (quoting Harris, 510 U.S. at 23.).

The allegations in Volpe's operative complaint do not rise to the level of a hostile work environment.  The conditions at PS 114X were not objectively hostile or abusive, and they did not alter the conditions of Volpe's employment there, which continues to the present day.  Volpe's complaint, which spans a decade, details three attempts at removing her from a particular position (but not firing her).  (FAC ¶¶ 20-23, 29-30.)  It includes an allegation of file theft, an assignment to perform breakfast duty, a public accusation of being against the school, and anonymous rumors that Francis-Webber was watching Volpe closely and wanted to make her work intolerable.  (Id. ¶¶ 24, 26, 28, 31, 47.)  Most importantly, it includes a § 3020-a charge and investigation and a period in which Volpe's colleagues watched her in an office.  (Id. ¶¶ 36, 44-46.)

The complaint also notes, however, that Volpe successfully grieved two of the attempted removals, and that although the third was adopted she was not fired. (Id. ¶¶ 20-23, 29-30.)  A handful of stray comments, all of which at most suggest personal animus bearing no connection to Volpe's alleged advocacy for her students, do not constitute an objectively abusive workplace.  The § 3020-a charge, which was initiated after an independent unit within the Department substantiated allegations that Volpe had forged a document, was dropped after Francis-Webber

herself informed the investigating unit that certain school employees might have evidence that would exonerate Volpe.  (Id. ¶¶ 37-38, Exh. C.)   And the three and a half hours Volpe spent in an assistant principal's office was not conduct that was so severe as to "work a transformation of the plaintiff's workplace."  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).  Accepting all of the allegations in the operative complaint as true, it still does not portray a workplace "permeated with discriminatory intimidation, ridicule, and insult," nor one that is threatening, humiliating, or even offensive.  The complaint thus fails to state a claim under a theory of retaliatory hostile work environment.

### 4.   The Discrete Retaliation Claim

The same requirements of a prima facie retaliation claim discussed above apply when such claims are considered on the basis of discrete acts rather than a hostile environment.  The three year statute of limitations limits the Court's inquiry to Volpe's allegations after September 9, 2012.

There is significant precedential support for the proposition that "a non-disabled individual who files a complaint of disability discrimination is engaging in activity protected under the ADA."  Manigaulte v. C.W. Post of Long Island Univ., 659 F. Supp. 2d 367, 375 (E.D.N.Y. 2009).  "Moreover, it is clear that informal complaints to management are considered protected activity under the Rehabilitation Act and the ADA.  Felton v. Katonah Lewisboro Sch. Dist., No. 08 Civ. 9340(SCR), 2009 WL 2223853, at *6 (S.D.N.Y. July 27, 2009).

The complaint only alleges two instances of protected activity within the statute of limitations.  The general allegations that Volpe reported and complained about a host of topics "[t]hroughout her tenure at PS 114X" are threadbare and conclusory and provide no information from which the Court or a party could understand or identify such reports and complaints.  (FAC ¶ 15.)  That paragraph of the complaint does not allege when Volpe created the reports, what form particular reports took, to whom they were directed, or any other concrete information that would permit them to be recognized as a particularized protected activity.  (See id.)  The allegations connected to a December 2012 written complaint are also not cognizable as a protected activity in the context of an ADA and Rehabilitation Act retaliation claim, as there is no allegation that that complaint referenced the provision of services to special education student.  (Id. ¶ 32.)

Thus, the protected activities which Volpe properly alleges are limited to two. First, "[d]uring the 2013/2014 academic year," Volpe filed several special education and safety complaints regarding the failure of PS 114X to properly evaluate special education students and to provide "support to [special education] students with dangerous and/or violent propensities."  (Id. ¶ 40.)  Second, on December 18, 2013, Volpe "tried to speak with a parent of a [special education] student who had been transferred out of [Volpe's] class;" December 18 was the day of that student's annual IEP meeting.  (Id. ¶ 43.)

To establish a connection between a protected activity and an adverse action, a plaintiff must allege that the former was a substantial motivating for the latter.

24

Cioffi v. Averill Park Cent. Sch. Dist., 444 F.3d 158, 167 (2d Cir. 2006).  Causation can be shown indirectly by demonstrating that the protective activity was closely followed in time by the adverse action.  Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001).  Volpe must rely on indirect proof giving rise to an inference of causation; the operative complaint is devoid of any allegations that Francis-Webber or any other Department employee ever referenced Volpe's advocacy in connection with any of the alleged adverse actions.

Volpe's complaint contains the following allegations regarding defendants' conduct following the timely protected activity: (1) from October 2013 to February 2014, Francis-Webber repeatedly summoned Volpe to disciplinary meetings and disciplinary letters were placed in Volpe's file; (2) on December 18, 2013, Volpe was directed to remain in a colleague's office for three and a half hours under supervision; (3) in March 2014 an unnamed PS 114X employee told Volpe that Francis-Webber had asked employees to watch her closely and look for incidents that could lead to charges of misconduct; (4) in September 2014 Volpe was assigned to a self-contained 2nd/3rd grade class, which was contrary to Volpe's expressed preferences.  (FAC ¶¶ 42-48.)

Precedent clearly establishes that the first, third, and fourth categories of conduct listed immediately above do not rise to the level of an adverse retaliatory action.  Criticism of an employee in the course of evaluating and correcting her work is not an adverse employment action.  Weeks v. N.Y. State Div. of Parole, 273 F.3d 76, 86 (2d Cir. 2001).  A negative evaluation letter can be considered adverse, but

only where there is an accompanying adverse result such as demotion, diminution of wages, or other tangible loss.  Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002); Sotomayor v. City of New York, 862 F. Supp. 2d 226, 254 (E.D.N.Y. 2012) (collecting cases).  Likewise, excessive scrutiny not connected to a particular change in the terms and conditions of employment is not an adverse action in the context of retaliation claims.  See, e.g. Lucenti v. Potter, 432 F. Supp. 2d 347, 364 (S.D.N.Y. 2006).  And the Second Circuit has distinguished between demotions, which are "evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices," and which may constitute adverse action, Weeks, 273 F.3d at 85, and mere reassignments, which do not.  Davies v. N.Y.C. Dep't of Educ., 563 F. App'x 818, 820 (2d Cir. 2014).

However, accepting all of the allegations in the operative complaint as true, the confinement on December 18, 2013 does rise to the level of a retaliatory adverse action.  Volpe alleges that she attempted to speak with the parent of a special education student about that student's rights and interests, and that she was immediately thereafter kept in an office under supervision by her colleagues.  (FAC ¶¶ 43-46.)  Although the confinement did not rise to the level of a Fourth Amendment violation, it could conceivably have dissuaded a reasonable employee from advocating on behalf of special education students.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  The causal inference between Volpe's attempts to speak with her student's parent and Francis-Webber's subsequent

conduct is also easily strong enough to survive a motion to dismiss.  Therefore, as to this incident only, Volpe has alleged a satisfactory <u>prima facie</u> case of retaliatory conduct directed at efforts to oppose discrimination on the basis of disability.  <u>See</u> 42 U.S.C. § 12203(a).

5.   <u>Collateral Estoppel</u>

Defendants argue that Volpe has already litigated her claims before a state agency and should be barred from re-litigating the same claims before this Court. In support of this contention, defendants submitted a New York State Division of Human Rights ("NYSDHR") Determination and Order After Investigation dated August 12, 2014, in support of their motion to dismiss.  (ECF No. 24, Exh. 2.)  This determination addresses a complaint Volpe filed with NYSDHR on April 7, 2014, in which she alleged that she had been subject to unlawful employment discrimination on the basis of both her age and her opposition to discrimination.  (<u>Id.</u>)  NYSDHR determined that there was no probable cause to believe the Department had engaged in the practices alleged.  (<u>Id.</u>)

However, the Second Circuit has indicated that state administrative proceedings are entitled to the same preclusive effect in the ADA context and the Title VII context.  <u>Joseph v. Athanasopoulos</u>, 648 F.3d 58, 64 n.6 (2d Cir. 2011). And the Supreme Court has long held that state administrative proceedings which have not been subsequently reviewed and affirmed by a court do not have preclusive effect on Title VII claims.  <u>Univ. of Tenn. v. Elliott</u>, 478 U.S. 788, 796 (1986).  As a result, court in this circuit have held that unreviewed adverse administrative

27

determinations do not preclude later federal litigation of ADA claims.  See, e.g., Fogle v. Monroe Cnty., 831 F. Supp. 2d 602, 607-08 (W.D.N.Y. 2011).

As a result of the preceding analysis in this opinion, the only remaining claim is one for unlawful retaliation under the Rehabilitation Act and ADA.  Accordingly, because there is no indication that any court has reviewed NYSDHR's August 2014 determination, it is not entitled to preclusive effect as to that remaining claim.

## IV.    CONCLUSION

For the reasons stated above, defendants' motion to dismiss (ECF No. 23) is GRANTED as to plaintiff's second and third causes of action, and GRANTED in part as to plaintiff's first cause of action, but DENIED as to the claim that plaintiff suffered retaliation in violation of the Rehabilitation Act and ADA on December 18, 2013.


          SO ORDERED.

Dated:        New York, New York
              July 14, 2016


                                        _____
                                              KATHERINE B. FORREST
                                              United States District Judge